IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

LESLIE LIDDELL, as the Personal )
Representative of the Estate of Robert )
Clay Liddell, Deceased, )
)
              Plaintiff, )
) Case No. CIV-03-1566-F
-vs- )
)
JANICE MELTON, individually, )
et al., )
)
              Defendants. )

**O R D E R**

      Before the court is Defendants' Motion for Summary Judgment, filed May 18, 2005 (docket entry no. 65).  Plaintiff has responded to the motion, and upon due consideration of the parties' submissions, the court makes its determination.

Statement of Case

      Plaintiff, Leslie Liddell, as the personal representative of the Estate of Robert Clay Liddell, brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants violated Robert Clay Liddell's rights under the Eighth and Fourteenth Amendments during his incarceration at Charles E. "Bill" Johnson Correctional Center ("BJCC") in Alva, Oklahoma.  At all times relevant to this action, defendant, Janice Melton, acted as warden for BJCC and defendant, Janet Dowling, served as case manager coordinator. Defendants, David C. Henneke, Robert L. Rainey, W. Mark Luttrull, Ted Logan, Beverly Young and Earnest D. Ware, served as members of the State Board

of Corrections. Defendants, Cecil Dooley, Devin Ferguson, Leon Arndt, Sam Jones and Todd Fink, were correctional officers or guards for BJCC.

In the Second Amended Complaint, plaintiff alleges that on July 9, 2003, Robert Clay Liddell ("Liddell"), was transported from the Department of Corrections' reception center in Lexington, Oklahoma to BJCC to commence participation in a regimented drug treatment program for drug abusers. The program which is known as a "boot camp" program, utilizes military basic training tactics and rigid military discipline. Plaintiff alleges that upon immediate arrival at BJCC, Liddell was ordered to commence strenuous calisthenics and physical exercise. Plaintiff alleges during these exercises, Liddell became incoherent, mentally disoriented, and in a physically-debilitated condition. According to plaintiff, Liddell thereafter lost consciousness and subsequently died without receiving any appropriate medical care or treatment. Plaintiff alleges that the conduct of defendants constituted cruel and unusual punishment in violation of the Eighth Amendment and denied Liddell due process of law in violation of the Fourteenth Amendment. Plaintiff seeks damages against all defendants in their individual capacities for those violations.

As stated, plaintiff alleges a separate due process claim against each of the defendants under the Fourteenth Amendment. However, the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners." Whitley v. Albers, 475 U.S. 312, 327 (1986). Although both the Eighth Amendment and Fourteenth Amendment protect the safety and bodily integrity of prisoners, the legal standards are virtually identical. Berry v. City of Muskogee, 900 F.2d 1489, 1494 n. 6 (10th Cir.1990). Because the Eighth Amendment, as "an explicit textual source of constitutional protection," defines the limits of government action, it controls over "the more generalized notion of substantive due process." Graham v. Connor, 490 U.S. 386, 395 (1989) (internal quotation marks omitted). Plaintiff's

amended complaint is thus construed as raising claims against defendants only under the Eighth Amendment. With their motion, defendants seeks summary judgment on those claims.

Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Statement of Facts

The following facts are undisputed or viewed in a light most favorable to plaintiff. Liddell was sentenced to five years in prison with the balance of his sentence suspended pending successful completion of a drug program after being convicted of a second offense of operating a motor vehicle under the influence of intoxicating drugs and unlawful possession of a controlled drug after a former conviction. The sentencing court recommended Liddell for the BJCC Drug Offender Work Camp or an equivalent program.

BJCC is a regimented treatment center, which generally receives inmates who have had drug or alcohol problems. The age group participating in the program can vary anywhere from 18 to 52 years of age. An assessment process is conducted at the Lexington Assessment and Reception Center ("LARC") to determine the offender's treatment needs.

The BJCC Drug Offender Work Camp consists of four phases: Phase I, a 60 to 90 day orientation/boot camp; Phase II, main treatment; Phase III, reentry; and Phase IV, aftercare. During Phase I, the inmate's daily schedule is highly structured with primary activities of physical training and exercise, drill and ceremony, and unit/facility work details. Drill instructors are responsible for the daily supervision and activities of inmates in coordination with unit staff. Phase I is split into two levels; Level 1 is usually 30 days. Level I begins with a new arrival orientation, haircut, initial unit orientation, bunk assignment and one phone call home. To complete Level I inmates must pass drill and ceremony and physical training standards, complete basic class work on sanitation, hygiene and other basic skills and comply with the rules and unit work assignments. In Level II, inmates begin substance abuse and education assessment, treatment readiness courses, 12-step programs and facility work assignments.

Since BJCC has opened, some 4,550 inmates have participated in the regimented treatment program. In August of 2001, there was one incident that occurred during new arrival orientation wherein an inmate passed out from locking his knees. The inmate received medical treatment. In August of 2002, an inmate, while in the reception area, had difficulty breathing. He vomited and became dizzy. The inmate received medical treatment. There is no indication from either of these incidents that the inmates conditions were due to any heat-related illness. Liddell is

the only inmate who died shortly after participating in the physical component of the new arrival orientation.

Prior to his transfer to BJCC, Liddell received a physical examination at LARC. The qualified healthcare professional who examined Liddell determined that he had no activity restrictions.

On July 9, 2003, Liddell was transferred to BJCC. A health screen was performed on Liddell at 1735 hours by defendant, Sam Jones ("Jones"). At 1745 hours, BJCC's qualified healthcare professional, Kendra Hada ("Hada"), reviewed the summary of the physical examination given at LARC, which contained no activity restrictions. No physical examination was given to Liddell at BJCC.

At approximately 1853 hours, Liddell, with about eight other inmates, commenced physical exercises for the new arrival orientation. The exercises were conducted outside and the temperature was approximately 99 degrees. Defendants, Cecil Dooley ("Dooley") and Devin Ferguson ("Ferguson"), were the drill instructors for the exercises. Defendant Jones supervised Dooley and Ferguson.

Jones had previously advised the inmates that they would be required in the new arrival orientation to run laps around the sand pit or "shock pit" area, do push ups and other physical activities. The sand pit was approximately 60 by 30 feet in size and approximately eight inches deep.

Ferguson had received basic first-aid and CPR training. This training included some instruction on the symptoms of a heatstroke. According to Ferguson, the symptoms included sweating profusely and then stopping sweating, becoming disoriented and pupils dilating. Ferguson had been instructed that the response for a person having a heatstroke was to move that person into a cool place and give that person plenty of water. Ferguson knew that a heatstroke could be fatal and was to be taken seriously.

5

Dooley had also received training in recognition of heat exhaustion and heatstroke. Dooley learned that the signs of heatstroke included dilation of pupils, excessive sweating to no sweating, disorientation, and increase and/or decrease in heart rate. Dooley had been taught that heatstroke could cause death. He had also been taught that hot and humid weather was more likely to cause heat exhaustion and heatstroke.

At approximately 1910 hours, after running at least four laps around the sand pit, engaging in about five minutes of calisthenics and having one water break, Ferguson observed Liddell swaying back and forth. Ferguson inquired of Liddell what was wrong and Liddell told Ferguson that he was dizzy. Dooley had also observed Liddell swaying back and forth and went over to inquire about Liddell. Ferguson stepped away and returned to conducting the new arrival orientation with the other inmates. Liddell told Dooley that he could not see. Dooley instructed Liddell to lie on his back. Liddell acted disoriented. Dooley then asked Liddell if he could see and he responded that he could see Dooley. Dooley instructed Liddell to get up and drink some water. Dooley then advised Jones that Liddell was disoriented. Jones had Liddell go to the water hose to drink water. Dooley then returned to conducting the new arrival orientation with the other inmates.

Jones asked Liddell what kind of medications he was taking. Jones did not understand Liddell's response. Jones then called Ferguson to report to the east property hallway door. Jones told Ferguson to have Liddell drink plenty of water. Ferguson told Liddell to drink water. Liddell drank a small amount of water, spitting out what was left in his mouth. Ferguson told Liddell to drink more water. Liddell closed his eyes and lowered his head. Ferguson asked Liddell to open his eyes, which he did, but he did not speak. Ferguson asked Liddell to speak, but he did not. At approximately 1917 hours, Jones called defendant, Leon Arndt ("Leon"), to come to

the new arrival orientation area. After he arrived, Arndt helped Ferguson take Liddell to the segregated housing unit's observation cell. Thereafter, Jones contacted central control to notify medical on-call. Arndt called Jones to the segregated housing unit at approximately 1923 hours. They laid Liddell in a bed feeling for pulse and watching his breathing. Liddell stopped breathing. Ferguson started rescue breathing. Defendant, Todd Fink ("Fink"), started rescue breathing with a mask. Hada, the on-call nurse, arrived at the segregated housing unit at approximately 1925 hours, found a faint pulse, and advised the officers to continue rescue breathing. At approximately 1935 hours, Dooley brought EMT personnel to the segregated housing unit's observation cell. Liddell was placed on a gurney, Fink started chest compressions and EMT personnel used a hand held breathing device. Dooley relieved Fink and continued chest compressions while Liddell was transported to the hospital. Fink followed the ambulance in a separate vehicle. Dooley continued compressions until Liddell was pronounced dead by the emergency room doctor at approximately 1954 hours.

Although new inmates would arrive and engage in new arrival orientation after 5:00 p.m., BJCC did not have any medical personnel on duty at the facility. Although on call medical personnel had been contacted, Liddell was taken to the segregated housing unit instead of the medical facility.

Hada testified that there was an unwritten policy proscribing physical activity at a certain temperature level. Hada could not recall the temperature level. However, according to Hada, the correctional officers were to wait until the temperature was below the designated temperature mark to begin physical activity.

The drill instructors were instructed to give water breaks every ten minutes. However, defendant, Janice Melton ("Melton"), BJCC's warden, testified that the practice for physical training in extreme temperatures was to do physical training

"hopefully" in a shaded area, providing for additional water breaks and reducing the amount of time the inmates were involved in the physical training.

Discussion

A. Defendants Fink, Arndt and Dowling

In her response brief, plaintiff requests that defendants, Todd Fink, Leon Arndt and Janet Dowling, be dismissed. Although defendants Fink and Arndt came into contact with Liddell, plaintiff states that these individuals did not act in a manner in which they may be held personally liable. As to defendant Dowling, plaintiff states that it appears that defendant was not involved in BJCC policymaking and did not have any supervisory role at BJCC. In addition, plaintiff states that defendant took no actions which lead to Liddell's death.

The court construes plaintiff's request as a motion for dismissal of the action against defendants, Fink, Arndt and Dowling, pursuant to Rule 41(a)(2), Fed. R. Civ. P. Although plaintiff has not specified in her response whether the dismissal should be with or without prejudice, the court concludes that the dismissal should be with prejudice. Plaintiff's request comes in the late stages of litigation and in the face of a summary judgment motion. Therefore, the court, in its discretion, dismisses plaintiff's claims against defendants, Todd Fink, Leon Arndt and Janet Dowling, with prejudice pursuant to Rule 41(a)(2).

B. Defendants Dooley, Ferguson and Jones

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 822 (1994) (quotation omitted). The test for an Eighth Amendment violation has both objective and subjective components. Id. at 834. The objective requirement is met when a plaintiff alleges a deprivation that is "sufficiently serious." Id. For a claim based upon failure to insure safety, the plaintiff "must show that [the inmate was]

8

incarcerated under conditions posing substantial risk of serious harm, *id*. at 834, otherwise described as "excessive risk to inmate health and safety," *id*. at 837, one "sure or very likely to cause serious illness and needless suffering." Helling v. McKinney, 509 U.S. 25, 33 (1993).  As to the subjective component, "deliberate indifference" describes a state of mind more blameworthy than negligence," Farmer, 511 U.S. at 833, but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*.  The test is not met "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts form which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id*. at 837.  In short, liability requires "consciousness of a risk." *Id*. at 840.  However, whether the prison official had the requisite knowledge of a substantial risk to an inmate's health or safety "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

In addition, a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 94, 104 (1976).  The objective requirement is met if inmate's medical condition "'"is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."'"  Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980)). The subjective component is met if a prison official "'knows of and disregards an excessive risk to inmate health or safety.'" *Id*. (quoting Farmer, 511 U.S. at 837).

A delay in providing medical care to a prisoner may constitute a violation of the Eighth Amendment. Hunt, 199 F.3d at 1224. Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances on which it is apparent that a delay in providing medical care would exacerbate the prisoner's medical problems. *Id.* and cases therein cited. Prison officials may also be held liable when the delay results in lifelong handicap or permanent loss. *Id.*

Viewing the evidentiary materials before the court in the light most favorable to plaintiff, the court concludes that plaintiff has presented sufficient evidence to raise genuine issues of fact as to her Eighth Amendment claims against defendants, Dooley, Ferguson and Jones. There is a genuine issue of fact as to whether defendants were deliberately indifferent to the substantial risk of harm to Liddell and deliberately indifferent to the serious medical needs of Liddell. The facts, as construed in a light most favorable to plaintiff, show that Liddell was ordered to commence strenuous physical exercises in a sand pit immediately upon his arrival at the BJCC, with an outside temperature of 99 degrees. The exercises occurred after 5:00 p.m. when no medical personnel were on duty. Although according to Melton, in extreme temperatures, additional water breaks were to be given and physical training was to be conducted in smaller increments, the facts indicate that Liddell was given the normal ten minute water break and the physical activity was not conducted in smaller increments. No additional precautions were taken. In addition, according to Hada, no physical activity was to occur when the temperature rose above a certain level.

The evidentiary materials in the record indicate that defendants knew that strenuous activity in high temperatures could cause serious injury or death. The defendants knew that heatstroke could occur in such conditions and that heatstroke could be fatal. The facts indicate that defendants had been trained as to the symptoms

of heatstroke and noticed some of those symptoms exhibited by Liddell.  Although Dooley and Ferguson did not think Liddell was experiencing heatstroke, a reasonable inference from facts is that they knew something was seriously wrong.  Liddell was disoriented,  was not drinking water successfully, was mumbling and then became non-responsive.  However, Liddell was not immediately taken inside, on-call medical or EMT personnel were not immediately called and Liddell was eventually taken to the segregated housing unit instead of the medical facility.  The court concludes that the evidence in the record is sufficient to raise a genuine issue of fact as to both the objective and subjective components of plaintiff's Eighth Amendment claims.  The evidence in the record, viewed favorably to the plaintiff, reflects that Liddell was intentionally exposed to a situation that undeniably called for close attention to the hydration and other  physiological needs, and the physical condition, of the prisoners who were required to engage in strenuous physical activity in exceptionally hot conditions shortly after completing a long bus trip to BJCC.  The court cannot say, as a matter of law, that no reasonable jury could find a § 1983 violation.

C.  Defendant Melton

Under §1983, a defendant may not be held liable under the theory of *respondeat superior*.  Gagan v. Norton, 35 F.3d 1473, 1476 n. 4 (10th Cir. 1994).  To establish supervisory liability, a plaintiff must show "an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997); *see also*, Woodward v. City of Worland, 977 F.2d 1392, 1399-1400 (10th Cir. 1992)(supervisory liability requires allegations of personal direction or of actual knowledge and acquiescence).  Upon review of the facts in a light most favorable to plaintiff, the court finds that plaintiff has submitted sufficient facts to raise a genuine issue of fact as to supervisory liability for defendant Melton.

11

Plaintiff has presented evidence that defendant knew of the physical activity conducted at BJCC, knew that July 9, 2003 was an exceptionally hot day, knew that in extreme temperatures, heatstroke could occur, and knew that medical personnel were not on site after 5:00 p.m. to attend to anyone who succumbed to a heat-related illness. The court concludes that plaintiff has submitted sufficient evidence to overcome summary judgment on her claims against defendant Melton.

D.  <u>Defendants Henneke, Rainey, Luttrull, Logan, Young and Ware</u>

As to the Department of Corrections' board members, the court finds that plaintiff has failed to present sufficient facts to raise a genuine issue of fact as to their liability under §1983 for violations of the Eighth Amendment. The Tenth Circuit has ruled that the requisite connection between the unconstitutional act and the authorized decisionmakers may be established when the governing body has exercised its decisionmaking authority with deliberate indifference to the constitutional rights of those affected by its decisions. <u>Ware v. Unified School Dist. No. 492</u>, 902 F.2d 815, 819 (10th Cir. 1990). Although the evidence presented shows that the defendants may have known about the boot camp at BJCC and the military-like discipline and physical activity that occurred at the facility, there is no evidence that these individual defendants knew the physical activity was being conducted in extremely hot temperatures, knew that it was being conducted in a sand pit or that it was taking place when no medical staff was on site. Plaintiff has not presented any authority that the existence of the boot camp program itself constitutes a violation of the Eighth Amendment. Nor, in the court's view, has plaintiff shown any evidence of acquiescence in a policy of BJCC that violated Liddell's Eighth Amendment rights. There is no evidence to show that the individual board members were aware of the conduct which occurred on July 9, 2003 and that they acquiesced in that conduct. There is no evidence that defendants exercised any decisionmaking authority with

deliberate indifference. The court therefore concludes that summary judgment as to plaintiff's claims against the DOC board members is appropriate.

Conclusion

Accordingly, Defendants' Motion for Summary Judgment, filed May 18, 2005 (docket entry no. 65), is **GRANTED in part** and **DENIED in part**. Summary judgment is granted as to plaintiff's claims against defendants, David C. Henneke, Robert L. Rainey, W. Mark Luttrull, Ted Logan, Beverly Young and Earnest D. Ware. Summary judgment is denied as to plaintiff's claims against defendants, Cecil Dooley, Devin Ferguson, Sam Jones and Janice Melton.

Plaintiff's claims against defendants, Todd Fink, Leon Arndt and Janet Dowling, are dismissed with prejudice pursuant to Rule 41(a)(2), Fed. R. Civ. P.

Entered this 6th day of July, 2005.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

03-1566p011(pub).wpd